IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUDY DIMAS,

        Plaintiff,

vs.                                                    No. CIV 03-1157 RHS

JO ANNE B. BARNHART, Commissioner
of Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

        THIS MATTER comes before the Court upon Plaintiff's Motion to Reverse and Remand for Administrative Agency Procedure, filed June 3, 2004 [Doc. No. 13].   The Commissioner denied Plaintiff's request for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits.

        Plaintiff, age 40, alleges a disability which commenced January 10,1995, due to ankylosing spondylitis with associated pain, post traumatic stress disorder and panic attacks.  The Commissioner denied Plaintiff's application for benefits both initially and on reconsideration.  After conducting an administrative hearing, the Commissioner's Administrative Law Judge ("ALJ") also denied the application, concluding that Plaintiff retained the residual functional capacity (RFC) for a reduced range of light work and that there were jobs existing in significant numbers that Mr. Dimas could perform.  Tr. at 5.   The Appeals Council denied  review of the ALJ's decision, thus the ALJ's decision is the final decision of the Commissioner.  Plaintiff now seeks review of that final decision pursuant to 42 U.S.C. §405(g).

At the time of the Commissioner's final decision, claimant was 40 years old, with a high school education.  His past relevant work experience was as a gas line installer, mechanic's helper and truck driver.  Tr. at 82.

The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence.  Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citations omitted). Additionally, the Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests.  Id. (citation omitted).

Plaintiff raises the following allegations of error with respect to the ALJ's decision: (1) the ALJ failed to properly develop the record when the claimant was unrepresented and his date last insured ("DLI") was nearly two years before the hearing; (2)  the ALJ erred in applying the Medical Vocational Rules ("grids") as a framework without seeking testimony from a vocational expert; and (3) the ALJ erred in finding that Plaintiff's post traumatic stress disorder and anxiety attacks were non-severe impairments.

"To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity."  Thompson at 1486 (citing 42 U.S.C. §423 (d)(1)(A)).  Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.  Id.; see 20 C.F.R. §§ 404.1520(a - f); 416.920.  The sequential evaluation process ends if at any step the Commissioner finds that the claimant is disabled or not disabled.  Id. (citations omitted).   At the first four levels of the evaluation, the claimant must show:  (1) that he or she is not working; (2) that he or she has an impairment or combination of impairments severe enough to limit the ability to do basic work

activities; (3) that the impairment meets or equals one of the listing of impairments in 20 C.F.R. Pt. 404, Subpt. P, App.1; or (4) that he or she is unable to perform work done in the past.

At step five, the burden shifts to the Commissioner to show that the claimant has a residual functional capacity ("RFC") to do work in the national economy other than past relevant work.  Thompson at 1487 (citations omitted).  The Medical-Vocational Guidelines ("grids") may be used at this step to determine whether disability exists.  20 C.F.R. Part 404, Subpt. P, App. 2. The grids reflect the existence of jobs in the national economy at various residual functional capacity ("RFC") levels by incorporating administrative notice of occupational publications and studies.  20 C.F.R. §§404.1566(d); 416.966(d).  This aids the Commissioner in determining what specific job types in the national economy the claimant can perform.  The grids assume that the claimant's sole limitation is lack of strength, i.e., an exertional impairment.  20 C.F.R. Part 404, Subpt. P, App. 2, §2000(e)(2).

The ALJ denied Plaintiff's case at step five of the sequential evaluation process. Based on the application of the grids,  the ALJ  found that Mr. Dimas  could perform other jobs existing in significant numbers in the national economy.   He therefore concluded  that plaintiff was not disabled within the meaning of the Social Security Act.  Tr. at 42.

Plaintiff told his doctors that he began to have difficulty functioning after serving in the Persian Gulf War in 1991.  Tr. at 16.  Mr. Dimas reported being under missile fire and witnessing burnt bodies during his tour.  Tr. at 27.

Plaintiff's medical records include a June 1995 note from an examining physician at Health Centers of Northern New Mexico which stated that Mr. Dimas had a long history of anxiety with panic attacks. Tr. at 129.  In October of 1996, Plaintiff received a "Persian Gulf Exam" at the Albuquerque Veteran's Administration Medical Center.  Tr. at 143.  The record of that examination noted that Mr. Dimas began suffering from anxiety, flashbacks and nightmares  in

February of 1991 and the neuropsychiatric systems review section listed those symptoms as well as PTSD with panic attacks and memory loss. Tr. at 144-148.

In March of 1997, Mr. Dimas was treated by Dr. Brad Cambron at the Health Centers of Northern New Mexico. Dr. Cambron prescribed Valium "for anxiety and also muscle spasms." Tr. at 122.

On July 1, 1998, Plaintiff received a consultative psychiatric examination from Dr. Michael Gzaskow. Dr. Gzaskow reviewed "ten pages of excellent notes from the Veteran's Administration Hospital...includ[ing] a Persian Gulf War Registry examination review dated February 10, 1998" and "six pages of excellent notes by a variety of physicians at the Health Centers of Northern New Mexico...[dated] April 28, 1997 to February 6, 1998." His report stated that Mr. Dimas "has seen Dr. Dietrich Busch (psychiatrist) at the local community mental health center for three years" however, no documents concerning that treatment were reviewed by Dr. Gzaskow and they are not included in the record of this case. Tr. at 149.

Dr. Gzaskow noted that Plaintiff had previously attempted suicide on five occasions, with the last attempt approximately one year prior to the date of his examination. Dr. Gzaskow's diagnostic impressions included post-traumatic stress disorder and general anxiety disorder with secondary panic attacks. He found that Mr. Dimas "has the ability to relate to others, ...can understand and follow directions [and]... can attend to simple tasks." Dr. Gzaskow mentioned that Plaintiff "states that he cannot withstand the stresses and pressures associated with daily work activities, based on his chronic anxiety with panic attacks and long-standing orthopedic problems...." Tr. at 145-153.

Dr. William Hunter, a non-examining consultant physician, completed a Psychiatric Review Technique Form (SSA-2506-BK) ("PRT") which tracks the procedure set forth in 220 C.F.R.§ 404.1520a. The completion of the PRT first requires a determination of the presence or absence of

"certain medical findings which have been found especially relevant to the ability to work," sometimes referred to as the "Part A" criteria. 20 C.F.R. § 404.1520a(b)(2).  The degree of functional loss resulting from the impairment is then quantified, using the "Part B" criteria. 20 C.F.R. § 404.1520a(b)(3).

The reviewing State agency mental health expert compared the evidence concerning Plaintiff's mental impairment with the criteria listed described in the Listing of Impairments and found that Plaintiff's symptoms did not meet the specific diagnostic criteria for affective disorder, mental retardation or autism, somatoform disorder, personality disorder or substance addiction disorder, but found Mr. Dimas had symptoms of an anxiety related disorder  Tr.at 155-161.  Dr. Hunter proceeded with the Part B analysis and concluded that Mr. Dimas had no functional restrictions on his activities of daily living and/or difficulty in maintaining social functioning, seldom had deficiencies of concentration, persistence or pace and never had episodes of deterioration or decompensation in work or work-like settings. Tr.at 162.  He concluded that there was no evidence of a severe psychological impairment. Tr. at 156.

On September 3, 1998, Dr. Lenore Herrera performed a consultative examination and disability evaluation.  She concluded that Mr. Dimas "is limited by chronic pain..., may have problems with lifting from the ground level..., standing, walking and sitting are pain-limited and during periods of acute panic and anxiety the patient may have problems functioning."   Her final diagnoses included "post traumatic stress disorder, referable to exposure in the Gulf War" and she noted that "the patient is being treated for this with Valium on a continuous basis and has become chemically dependant on this drug." Tr. at 172-174.

On July 13, 2000, Dr. Cambron opined that Plaintiff's "prognosis is unchanged and chances are that this will not change over the long run.  Between PTSD and resulting anxiety and panic attacks, Mr. Dimas has difficulty working in the public sector." Tr. at 176.

Plaintiff's VA records from 2000-2002 list diagnoses of "severe anxiety attacks" Tr. at 27, "chronic severe PTSD, " Tr. at 20, and "panic disorder with agoraphobia." Tr. at 24. Mr. Dimas received GAF scores between 35 and 45 from VA mental health providers during that time period. Tr. at 18, 20, 21, 29.[1] He again attempted suicide in 2001 but the bullet he discharged missed him and put a hole in the roof. He told his doctor that his brother-in-law disarmed him after that incident and that his brother-in-law took his gun away and has not returned it to him. Tr. at 21. On October 9, 2001, Dr. Bruce Hinrichs, VA staff psychiatrist, expressed concern regarding Plaintiff's medications because of "lethality in overdose in this sometimes suicidal patient" and Mr. Dimas agreed to entrust his medications to his mother and replenish his supply from her on a weekly basis. Tr. at 17.

**First Alleged Error**

Mr. Dimas alleges that the ALJ failed to adequately develop the record by obtaining medical records which covered the period prior to December 31, 1998, the date when he was last insured. He argues that because the medical records submitted to the ALJ indicate that he was under the care of a psychiatrist, Dr. Dietrich Busch, the ALJ should have obtained information from Dr.Busch before determining that his mental impairment was not severe.

"Although a claimant has the burden of providing medical evidence proving disability, the ALJ has a basic duty of inquiry to fully and fairly develop the record as to material issues." Carter v. Chater, 73 F.3d 1019, 1021 (10th Cir. 1996) (citing Baca v. Department of Health & Human Servs., 5 F.3d 476, 479-80 (10th Cir.1993) (citations omitted)). This duty is especially strong in

---

[1]The GAF score is used to report "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30 (4th Ed. 1994). The GAF scale defines the range from 41-50 as "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." A GAF of 35 represents more extreme impairment. Id. at 34.

the case of an unrepresented claimant. Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir.1992).

The [Commissioner] must consider all relevant medical evidence of record in reaching a conclusion as to disability. Baker v. Bowen, 886 F.2d 289, 290 (10th Cir. 1989) (citing Ray v. Bowen, 865 F.2d 222, 226 (10th Cir.1989)). An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing. Carter v. Chater, 73 F.3d 1019, 1021 (10th Cir. 1996).

Plaintiff was informed at the time of the hearing that he could submit additional medical evidence for the ALJ's consideration. The fact that the unrepresented, allegedly mentally ill Plaintiff failed to take advantage of this opportunity does not relieve the ALJ of his duty to thoroughly investigate all the issues presented in this case.

The ALJ was aware that medical records which might have helped him make an informed decision had not been submitted to the Administration. The Court finds that the ALJ's failure to fully and fairly develop the record requires a remand for that evidence to be obtained and reviewed by the Administration.

**Second Alleged Error**

Plaintiff alleges that the ALJ erred by using the grids as a framework for meeting the Administration's burden at step five of the sequential evaluation process. Mr. Dimas argues that testimony from a vocational expert should have been utilized in this case.

Application of the grids is appropriate only if the claimant is capable of performing a full range of work required at a particular exertional level on a daily basis and if the claimant possesses the physical capacity to perform most of the jobs falling within that category. Ragland v. Shalala, 992 F.2d 1056, 1058 (10th Cir.1993). "When a claimant presents evidence of both exertional and non-exertional impairments, the grids are not conclusive but merely form a framework for disability

determination.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2), cited in Gathright v. Shalala, 872 F.Supp. 893, 897 (D.N.M. 1993).  In that situation, the ALJ must make findings on how much a claimant's work ability is further diminished by the non-exertional limitations.  Id.  If the claimant's nonexertional limitations are significant enough to reduce further his or her work capacity, the ALJ may not rely upon the grids but instead must give full consideration to all relevant facts, including vocational expert testimony if necessary, in determining whether the claimant is disabled.  Id."

Here the ALJ applied the grids as a framework but did not call a vocational expert.  The ALJ found Plaintiff capable of performing a reduced range of light work, but his decision fails to describe what he meant by "reduced range."  Furthermore, even in the absence of records from Plaintiff's treating psychiatrist, there is ample evidence that Mr. Dimas' occupational functioning may have been impaired during the pertinent time period by mental health problems.  Application of the grids in this situation was erroneous.

**Third Alleged Error**

Plaintiff contends that the ALJ erred in finding that his PTSD and panic attacks were non-severe impairments.  Although there is a gap in the record prior to the DLI (which may be remedied on remand by production of Dr. Busch's treatment notes), there is evidence that Plaintiff's treating physicians believed he was suffering from moderate to severe PTSD in 2001 and 2002.  Tr. at 16, 20, 24.  At least six suicide attempts were mentioned by Plaintiff's physicians, five of them occurring prior to the DLI.

Plaintiff's GAF scores indicated pronounced difficulties throughout 2000, 2001 and 2002. Tr. at 18, 20, 21, 29.   On June 13, 2000, Dr. Cambron, who began treating Plaintiff in 1997, wrote that Plaintiff's prognosis was unchanged and that between PTSD and resulting anxiety and

panic attacks, Mr. Dimas had difficulty working. Dr. Cambron also stated that Plaintiff had experienced no change in his long-term difficulty with attending public functions.

The Commissioner makes several arguments in response to Plaintiff's third allegation of error which are not supported by the record. She argues that the Plaintiff's one low GAF score does not indicate severe limitations on a long term basis, however, the record actually includes several GAF scores ranging from 35 to 45 which Plaintiff received over an extended period of time. Tr. at 18, 20, 21, 29. The Commissioner also contends that Dr. Cambron's July 13, 2000 letter stating that Plaintiff had been "able to go several months without any significant outbreaks that I am aware of," Dr. Hinricks' note from October 2001 stating that he advised Plaintiff not to take so much Valium and a December 2001 note from a clinical triage specialist stating that Plaintiff would benefit from therapy provide support for the ALJ's determination that Plaintiff's mental problems were non-severe. The Commissioner omitted critical information when she cited each of these documents.

Dr. Cambron's letter, in addition to stating that Plaintiff had experienced no outbreaks in several months, opined that Plaintiff's PTSD caused him difficulty in public work and social situations. Tr. at 176. Dr. Hinrich expressed concern regarding the amount of medication prescribed for Plaintiff in part because he recognized that Plaintiff was "sometimes suicidal." Tr. at 17. The clinical triage specialist noted that Plaintiff would benefit from therapy but stated that "due to geographical/logistical constraints [he] is unable to participate in the full program." Tr. at 20. A careful reading of these documents fails to convince the Court that they provide support for the ALJ's decision.

The ALJ based his decision primarily on the opinions of the consultant physicians who were not afforded an opportunity to review records from Plaintiff's treating psychiatrist. The existing record contains opinions from treating sources which differ from the consultants and which were

-9-

generated after the DLI, but which appear to relate back to the pertinent time period. The Court finds that the ALJ may have given improper weight to the consultant physicians' opinions in reaching his conclusion that Plaintiff did not suffer from a severe mental impairment.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision , filed June 3, 2004, [Doc. No.13] is **GRANTED**. On remand, the Commissioner is directed to obtain all relevant medical records, to thoroughly evaluate documents relating to Plaintiff's treatment by Dr. Busch as well as records of treatment Plaintiff received after his DLI which may relate back to Plaintiff's condition during the pertinent time period, to give the opinions of Plaintiff's treating physicians proper consideration and to seek testimony from a vocational expert to determine whether specific jobs appropriate to Plaintiff's limitations exist in the national economy.

_____
ROBERT HAYES SCOTT
UNITED STATES MAGISTRATE JUDGE